## VIDAL v. SOUTH AMERICAN SECURITIES CO. et al.

(Circuit Court of Appeals, Second Circuit. August 15, 1921. On Petition for Rehearing, January 11, 1922.)

No. 69.

1. Courts ⊛⇒321—Alien entitled to sue in federal court.
    Under Judicial Code, § 24 (Comp. St. § 991), an alien is entitled to sue a citizen of the United States in a federal court.

2. Courts ⊛⇒270, 274—Alien may sue citizen, but must sue in district of residence.
    An alien can maintain a suit in the federal courts against a citizen only in the district of the latter's residence, unless defendant waives his privilege, and a corporation cannot without its consent be sued by an alien in any district out of the state where it is incorporated. and, if there is more than one district in such state, then the suit should be brought in that district in which it has its headquarters and general offices.

3. Courts ⊛⇒276—Pleading to merits not waiver of objection to jurisdiction.
    In the federal courts, if a defendant appears specially for the single purpose of objecting to the jurisdiction of suit by alien in district in which defendant is not a resident and his objection is overruled and he excepts to the overruling thereof and then pleads to the merits, he is not considered as waiving or abandoning his objection and may raise the question on writ of error in the appellate court.

4. Courts ⊛⇒269—Stocks and bonds "property" within statute relating to jurisdiction of federal courts.
    Stocks and bonds are "property" within the meaning of Judicial Code, § 57 (Comp. St. § 1039), which authorizes a suit to be commenced in any

⊛⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

District Court of the United States to enforce any legal or equitable lien upon or claim to real or personal property within the district against one who is not an inhabitant of or found within the district.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property.]

**5. Corporations ⬤═65—Shares of stock not "chattels" and have situs in different places.**

Shares of stock are not chattels, but are in the nature of choses in action, are intangible incorporeal personal property, and may have a situs for some purposes at the domicile of the owner and for some purposes at the domicile of the corporation, and it makes no difference in determining such situs where the certificate of stock may physically be, since it is merely evidence of title to the stock.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Chattel.]

**6. Courts ⬤═269—Suit must be one to enforce lien upon or claim to property to give jurisdiction.**

If a suit in a federal District Court against one not resident or found in the district is not one to enforce a lien upon or claim to property of the defendant within the district, or to remove a cloud upon the title to such property, the court is without jurisdiction to proceed, under Judicial Code, § 57 (Comp. St. § 1039).

**7. Courts ⬤═269—"Lien," within statute giving court jurisdiction of action against nonresident having property in district, defined.**

The term "lien," within Judicial Code, § 57 (Comp. St. § 1039), giving federal District Court jurisdiction of an action against one not resident or found in the district to enforce a lien on property therein, is the right which a creditor has to obtain satisfaction of a debt or duty out of a specified res which is owned by the defendant; that is, it is a charge or incumbrance upon specific property which is security for the payment of money or the performance of some duty.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lien.]

**8. Courts ⬤═269—Plaintiff held not to have lien on property giving District Court jurisdiction of action; "profit."**

Where plaintiff contracted to render certain services for 30 per cent. of the net profits arising from an enterprise, without anything being said as to a lien on moneys paid or stocks or bonds delivered to defendant and out of which the profits were to be realized, defendant cannot be regarded as a constructive trustee holding such money and stocks and bonds, and was at liberty to use them as he saw fit, being simply a debtor to plaintiff, and plaintiff had no lien on the property within the meaning of Judicial Code, § 57 (Comp. St. § 1039), giving federal District Court jurisdiction of an action against one not resident or found in the district to enforce a lien upon property therein; "profit" being the gain made in a business transaction, and representing the excess of acquisition over expenditure.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Profit.]

**9. Courts ⬤═269—"Claim" as used in statute giving federal District Court jurisdiction against nonresident, defined.**

The word "claim," as used in Judicial Code, § 57 (Comp. St. § 1039), giving federal District Court jurisdiction of an action against one not resident or found in the district to enforce a claim to property, is the right to lay claim to a specific property which is in another's possession, and does not give to a mere general creditor a right to sue a nonresident when he has no lien and no claim of ownership in the property to assert.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Claim.]

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Courts ⬅269—What constitutes suit to remove incumbrance or cloud upon title to property to give federal District Court jurisdiction.**

Under Judicial Code, § 57 (Comp. St. § 1039), giving federal District Court jurisdiction of an action against one not resident or found in the district to remove an incumbrance or lien or cloud upon the title to property, one can only bring a suit concerning property to which he is himself entitled.

**11. Appeal and error ⬅790(1)—Appeal dismissed if effectual relief cannot be given.**

It is the duty of an appellate court to dismiss an appeal and not proceed to formal judgment if pending the appeal an event occurs without any fault of the defendant which renders it impossible for the court, if it should decide the case in favor of the plaintiff, to grant any effectual relief whatever.

**12. Appeal and error ⬅799—Extrinsic evidence admissible to show issue moot.**

On appeal, facts which have occurred since the decree below and which make the question at issue moot, and which are outside of the record, may be proved by extrinsic evidence.

Hough, Circuit Judge, dissenting.

On Petition for Rehearing.

**13. Courts ⬅351½—Counterclaims treated as original bills, and not dismissed.**

Where counterclaims, which, under equity rules 30 (201 Fed. v, 118 C. C. A. v) and 31 (198 Fed. xxvii, 115 C. C. A. xxvii), are substituted for cross-bills against certain defendants, set up causes of action within the jurisdiction of the court as a court of equity, and within its jurisdiction as a federal court because of the citizenship of the parties, except as to one cross-defendant, they should not be dismissed, but should be treated as original bills on the dismissal of the original bill.

**14. Courts ⬅307(1)—Jurisdiction of federal court limited to controversies between citizens of different states.**

The jurisdiction of a federal District Court is limited to controversies between citizens of different states, and counterclaims, which, under equity rules 30 (201 Fed. v, 118 C. C. A. v) and 31 (198 Fed. xxvii, 115 C. C. A. xxvii), are substituted for cross-bills by certain defendants against other defendants, were properly dismissed as to a cross-defendant, who, although a citizen of the United States, was domiciled and engaged in business in a foreign country for many years.

**15. Equity ⬅415—Rights of parties not within jurisdiction not to be determined.**

Rights of persons not parties or persons not within the jurisdiction of court should not be determined in a civil action.

Appeal from the District Court of the United States for the Southern District of New York.

Bill by Enrique De Arraga Vidal against the South American Securities Company and others, in which cross-bills were filed. From adverse decrees, the named defendant appeals. Reversed with directions.

The appeal is from a decree of Judge A. N. Hand, entered on March 28, 1916, and from a decree of Judge Mayer, entered on October 30, 1917.

The case was tried before Judge Hand and was decided by him in an elaborate opinion. He, however, directed a reference to a special master to investigate and report on certain facts. The master filed a comprehensive report which came before Judge Mayer, who confirmed it as is hereinafter more fully stated.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The complainant is an alien, being a citizen of Uruguay.

The South American Securities Company, named as a defendant, is alleged to be a New York corporation, and to have its principal office and to be doing business in the Southern District of New York. It is hereinafter referred to as the Securities Company.

The Pan-American Transcontinental Railway Company, another defendant, is alleged to be a Maine corporation, and to have its principal office and to be doing business in the Southern District of New York. It is hereinafter referred to as the Railway Company.

The National Railway Construction Company, also a defendant, is alleged to be a Maine corporation, and to have its principal office and to be doing business in the Southern District of New York. It is hereinafter referred to as the Construction Company.

The defendants, Charles Bright (hereinafter called Bright), Frederick R. Bright, John Jay McKelvey, and Alpheus H. Favour sued individually and as copartners doing business under the firm name of McKelvey & Favour; Charles R. Demarest, Edward L. Thompson, Warren G. Thompson, and Ralph H. McKelvey are all alleged to be citizens of the state of New York; and they are all alleged to be of the city of New York except Warren G. Thompson, who is said to be of North Tonawanda in this state. In his answer Bright denied that he was a resident of the state of New York or that he was served within the Southern District. He admitted himself to be a citizen of the United States and alleged that he was domiciled in the city of Buenos Aires, in the republic of Argentine, where he was engaged in business as a merchant. And Frederick R. Bright in his answer denied that he was a citizen of the state of New York and alleged that he was a citizen of the state of California, but he admitted "that he now resides in the Southern District of New York."

The defendant William F. Piper is alleged to be of Tenafly in the state of New Jersey.

The other defendants are alleged to be citizens of foreign states: Thomas B. Holoway is alleged to be a citizen of the Argentine Republic; Fanny Yaureguiberry de Castro, sued individually and as administratrix of Juan Jose Castro, is alleged to be a citizen of the republic of Uruguay, as are the defendants Enrique Castro, Marta Castro, Juan Jose Castro, and Fanny Maria Castro.

The complaint alleges that the Railway Company is the owner of certain rights and franchises under a concession granted by the republic of Uruguay, on July 15, 1909, for the construction of the Interior Railway of Uruguay. It alleges also that the Construction Company is engaged in the construction of the said Interior Railway, under a contract with the Railway Company aforesaid.

The complaint sets out in minute detail the relations of the various defendants to the enterprise, and alleges that the defendant Bright either directly, or indirectly through his agents, obtained possession of a large amount of securities for his services.

The cause of action, briefly stated, is that defendant Bright agreed with the complainant that if the complainant would co-operate with and aid him, Bright, in procuring certain concessions from the government of Uruguay to the Railway Company, he (Bright) would pay to the complainant 30 per cent. of his profits. That the complainant did so co-operate and did obtain the concession as agreed, and that the complainant is entitled to the promised 30 per cent. of Bright's profits.

The relief demanded in the complaint is:

1. An injunction restraining the defendants from disposing of any of the securities of Bright or of the Securities Company which any of the defendants have in their possession or control.

2. A discovery in respect to all matters and things concerning the securities.

3. An accounting from Bright and the Securities Company.

4. That the rights of the complainants in the securities be fixed and determined, and that an order of distribution be entered.

5. That an injunction be issued restraining all other suits and proceedings in the premises.

6. That Bright be adjudged the beneficial owner of all of the stock of the Securities Company.

That defendants Frederick R. Bright and Favour be enjoined from disposing of any of said stock. That it be adjudged that the said stock and all securities so far as the same are a part of the securities in which Bright and the Securities Company, or either of them hold the beneficial interest, held in the names of defendants Piper, Demarest, Thompson, and Ralph M. McKelvey is a part of the said Bright's receipt from the railway enterprise, and is subject to the claims of the complainant and to the claims and liens of such other parties as may establish the same to the satisfaction of the court.

The Securities Company and the two Brights filed pleas in which they asserted that the court was without jurisdiction upon the ground that Bright was not a resident of the state of New York and was not served within the Southern District of New York, and that the action was not one to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon title to property within the Southern District of New York.

The motion for judgment on the pleadings came before Judge Coxe sitting in the District Court and was disposed of by him in an opinion filed on April 2, 1913. He overruled the motion and permitted the defendants to answer within 20 days.

Thereafter elaborate answers were filed. The answer of Bright occupies 158 printed pages of the record; that of the Securities Company, 67 pages; and that of Frederick R. Bright, 24 pages. The answers all allege that the bill of complaint is wholly without equity and that the court is without power to grant the relief asked for.

The answers interposed by the two Brights and by the Security Company each assert that the complainant by false and fraudulent representations made by him for the purpose induced Charles Bright to enter into the alleged agreement in the words and letters as follows:

"London, July 22, 1907.

"Charles Bright, Esq.,— Dear Sir: Under the terms of a letter signed by Juan Jose Castro, concessionaire of the Interior Railway of Uruguay, I am entitled to a commission of $100,000, Uruguayan gold, in case I negotiate the concession.

"I hereby agree to pay to you one-third of this sum or any other commission that I may receive from the heirs or successors of the said Mr. Castro in consideration of your agreeing to pay to me for myself and the people whom I represent thirty per cent. (30%) of the net profits that you may make in negotiating the said concession, after paying out or deducting all expenses. obligations or commissions, or other sums whatsoever that you may incur in connection with the said business, and a further sum of £5,000 to be deducted for your personal expenses.

"This letter as agreed by you will have full legal effect in Montevideo.

"Yours faithfully,                                    [Signed] H. D. Arraga Vidal.

"I agree to the above terms.

"C. Bright."

The answers also set forth in detail the alleged false and fraudulent representations by which it is asserted that Bright was induced to enter into the pretended agreement, and it is alleged that the complainant knew that they were false.

The answers also deny that the complainant did anything under the pretended agreement which entitled him to the 30 per cent. or any portion of either the securities or the profits realized by Bright from the enterprise referred to in the complaint.

By a cross-bill the Railway Company and the Construction Company sought a decree rescinding and canceling two contracts, both dated February 8, 1910, between the Railway Company and the Securities Company, and between the Securities Company and the Construction Company, providing for the issuance

to the Securities Company of certain second mortgage bonds, known as 5 per cent. gold debenture bonds, and certain common and preferred stock of the Railway Company, and certain common stock of the Construction Company. The grounds for the rescission and cancellation as alleged were fraud and failure of consideration on the part of the Securities Company and of Bright.

The Securities Company in its answer also set up a counterclaim in which it alleged ownership of bonds and common and preferred stock of the Railway Company aggregating more than $1,000,000 par value and $900,000 par of the common stock of the Construction Company, and that it had come wrongfully, fraudulently, and unlawfully into the possession of the defendants McKelvey and Favour who refused to deliver the same to it. It alleged that through its ownership of the stock of the Railway and of the Construction Company it had a controlling interest in those companies, but that it was prevented from voting the stock by the wrongful acts of McKelvey to its great loss. It asked judgment against the defendants McKelvey and Favour individually and as copartners, and that they be directed to turn over to the defendant the securities as described and that they pay in addition the sum of $500,000 in damages.

The defendant John MacDonald Henderson was not named as a party in the original complaint. He petitioned to be made a party on the ground that he was the trustee in bankruptcy in Great Britain of the estate of Bright adjudicated a bankrupt in the courts of that country, and the prayer of his petition was granted.

An injunction was issued on October 16, 1912, pursuant to an order of Judge Learned Hand, restraining the defendants pending the suit from in any manner dealing with or disposing of any of the securities as complained of in the bill which were then held by them or either of them on behalf of Bright or of the Securities Company.

An order was entered on July 18, 1913, by Judge Coxe, sitting in the District Court, appointing a receiver of all stocks and bonds in the possession of the defendants McKelvey and Favour for the account of Bright and for the account of the Securities Company. The receiver was directed to hold the same pending the litigation or until the further order of the court.

It appears that in 1907 Bright employed the defendant John Jay McKelvey to incorporate the Railway Company, and it was in that year incorporated under the laws of Maine. In the same year he incorporated the Construction Company under the laws of the same state. In the following year Bright employed McKelvey to incorporate the Securities Company, and it was so incorporated under the laws of New York. The stock of the Securities Company consisted of 1,000 shares, of which 670 shares stand in the name of Bright and the remaining 330 shares in the name of his brother Frederick. The trial judge found that these 330 shares belonged to Charles who furnished the consideration and that he was the absolute owner of all of the stock of the Securities Company, and that he paid for it by turning over shares of the common stock of the Railway Company having a par value of $500,000, which had been issued to him by a resolution of the board of directors of the Railway Company adopted on September 20, 1907, "as compensation for investigations, surveys, and reports in connection with corporate enterprise."

It further appears that on October 24, 1908, the Securities Company entered into an agreement with Bright which recited that "Bright has obtained * * * rights and franchises under a concession originally granted to Castro, Petty & Co. and subsequently transferred" all these rights to the Securities Company, and that thereafter the concession became vested in the Railway Company, and that it had been agreed that certain considerations consisting of cash and stocks should be paid to Bright for obtaining the same. It went on to provide that the Securities Company should pay to Bright £60,-000 in cash upon ratification of the ad referendum agreement by the Legislature, and £60,000 in shares of the Pan-American Transcontinental Railway Company, said shares to be preferred shares in case the Railway Company should issue any part of its capital in the form of preferred stock, and to be delivered at the same time as the cash payment.

On the same day that the foregoing agreement was made, an agreement was also entered into between the Securities Company and the Railway Company. The Securities Company, it recited, had acquired control of the Castro Franchise as modified in the ad referendum agreement and had assigned the same to the Railway Company, and it provided for the construction of the railway by the Securities Company or a Construction Company to be furnished by it.

The last-named agreement was canceled on February 8, 1910, by a new agreement between the Securities Company and the Railway Company, and it was agreed that the Railway Company should cause to be issued to the Securities Company the following securities:

$1,200,000 of its 5 per cent. gold debenture bonds.
800,000 par value of its preferred stock.
1,000,000 par value of its common stock.

—said securities to be issued and delivered upon the completion and signing by the Railway Company of a satisfactory contract with a contractor to be furnished by the Securities Company. The Securities Company agreed to execute any further papers necessary to perfect the title of the Railway Company in all of the rights and franchises granted to it and to furnish a contractor to construct the railway in accordance with the requirements of the concession in consideration of the payment to such contractor of the following securities of the Railway Company:

$9,000,000 par value of its 5 per cent. first mortgage gold bonds.
2,000,000 par value of its 5 per cent. gold debenture bonds.
1,200,000 par value of its preferred stock.
1,500,000 par value of its port income bonds.

On the same day, February 8, 1910, the Railway Company entered into a contract with the Construction Company for the construction of the line. By this agreement the Construction Company agreed to pay the obligations which had been incurred by Bright for preliminary surveys amounting to $25,000, and it also agreed to construct the railway in accordance with the government concessions and decrees, and to furnish the railroad with an initial operating capital of $250,000. There were to be delivered upon the execution of the agreement:

$2,000,000 par value 5 per cent. gold debenture bonds.
1,200,000 par value of preferred stock.
5,000,000 par value of common stock.
1,500,000 par value of the port income bonds.

It provided also that the Construction Company upon the completion of each section of road should receive first mortgage bonds in proportion to the extent of the section so approved.

On the same day, February 8, 1910, an agreement was also signed between the Securities Company and the Construction Company. It provided that the Securities Company should:

1. Procure the execution of a construction contract between the Railway and the Construction Company.

2. Procure for the latter an advance of $100,000 upon the security of a note of the Construction Company.

3. Negotiate an advantageous arrangement for the disposition of the securities to be received by the Construction Company from the Railway Company as consideration for the construction work.

4. Provide as working capital cash subscriptions at par to the stock of the Construction Company amounting to $500,000.

In consideration of the above agreements the Construction Company contracted to issue and deliver to the Securities Company $1,000,000 par value of the capital stock of the Construction Company, the aggregate of which authorized capital stock was $1,500,000.

It thus appears that Bright owned all the stock of the Securities Company, that the Securities Company was to have the majority of the stock of the Construction Company, and that that company was in turn to control the Railway Company by holding $5,000,000 of common and $1,200,000 of prefer-

red stock out of a total issue of $6,500,000 of common and $4,500,000 of preferred stock.

The decree of March 28, 1916, found that in 1889 a concession was granted by the government of Uruguay to Juan Jose Castro to build a railroad in that republic. That that concession on December 31, 1907, although then regarded as of doubtful value, was transferred to the Railway Company. That in February, 1908, the executive power of the republic of Uruguay entered into what is referred to as an ad referendum agreement by which the government granted the concession to one Holoway as the representative of the Railway Company. That in July, 1909, a law was passed which authorized the executive power to contract for the construction of the railway, and under which the original Castro concession was granted. That in September, 1909, the heirs of Castro and other owners of an interest in the old concession contracted with Bright as attorney in fact of the Railway Company for the sale of all their rights in the concession. That in October, 1908, Bright entered into a contract with the Securities Company, which he had caused to be incorporated, in which it was stated that Bright had transferred to the Securities Company the concession originally granted to the Castros, and that thereafter the Securities Company, in accordance with its understanding with Bright, had transferred the concession to the Railway Company; it having been agreed that certain securities and cash should be paid therefor to Bright or to such person or persons as he might direct for obtaining the concession. That the decree also found, among much other detail which need not now be recited, that the basis of the entire enterprise was the transfer by Bright or the Securities Company to the Railway Company of a concession the title to which should be perfect and without incumbrances; and that this was the consideration for all the securities which Bright or the Securities Company received with the exception of $500,000 of the common stock of the Railroad Company originally issued to Bright. That no concession was in fact ever transferred by the Securities Company to the Railway Company, but that the latter obtained the concession direct from the Castro interest, and that the concession was charged by Bright with various incumbrances which the Railway Company had to assume and discharge in order to obtain the benefit of it. It referred to the special master the question whether the concession had a net value after deducting the disbursements, obligations, and incumbrances which the Railway Company was obliged to pay or incur, or was reasonably justified in paying or incurring in order to obtain the concession unincumbered. And if it should be found that after such deductions had been made the concession had no net value, it decreed that the receiver should restore to the Railway Company and to the Construction Company the securities in his hands which had been issued by these companies respectively as a consideration for the valid and unincumbered concession which Bright and the Securities Company had agreed to turn over but had failed to perform. If, however, upon the coming in of the report it should be found that there was a net value in the concession, after making the deductions, the receiver was to turn over the securities on payment to him of the net value of the concession so ascertained and found.

The decree found that the complainant, Vidal, was entitled to 30 per cent. of any amount which the Railway Company might be found liable to restore under the contract between Vidal and Bright dated July 22, 1907, and which represented the net profits to Bright as a result of his negotiating the railway concession, less any amounts in money or securities which it might appear Bright had paid to Vidal on account of the contract between them; and that the net profits were to be determined after paying out or deducting all expenses, obligations, or commissions or other sums which Bright had incurred in negotiating the concession, and a further sum of £5,000 to be deducted for his personal expenses, so far as any such obligations, commissions, or expenses, whether personal or otherwise, remained unpaid. The decree dismissed the cross-claim which had been made by the Securities Company against John Jay McKelvey and Alpheus H. Favour individually and as copartners doing business under the firm name of McKelvey & Favour for $500,000 damages, there being no evidence whatsoever as to any injury done to the Securities Company

by them. It also directed that the amended bill of complaint be dismissed as to the defendants Frederick R. Bright, William F. Piper, Charles R. Demarest, Edward L. Thompson, Ralph H. McKelvey, and Warren G. Thompson: they having no right, title, or interest in or to any of the securities forming the subject-matter of the suit.

The decree found that Bright had been adjudged a bankrupt by the High Court of Justice of the United Kingdom of Great Britain and Ireland, and that that court having jurisdiction of Bright and of the matter of the adjudication of his bankruptcy had appointed the defendant Henderson a trustee in bankruptcy of his estate, and that he had duly accepted the appointment and duly qualified as such trustee and claimed any net profits which might exist up to the sum of $150,000; that being the total of Bright's liabilities in bankruptcy.

The decree further found that there was a complete breach in limine on the part of the Securities Company of the contract between it and the Railway Company of such a fundamental and essential character that the Railway Company is entitled to rescission and cancellation of the said contract, and to a return of all the securities delivered to the Securities Company or to Bright for its account and held by either of said Securities Company or the said Bright, upon the restoration of the net value of the concession as herein provided, except the $500,000 common stock of the Railway Company separately delivered to the said Bright for his own personal account, together with all coupons originally attached to any of the said securities.

The decree further found that there had been a complete breach of the contract between the Securities Company and the Construction Company, and it adjudged that the Construction Company was entitled to a rescission and cancellation of the contract and to a return of the securities in the hands of the receiver, or delivered to the Securities Company or to Bright for account of the Securities Company, subject to an exception which need not here be noted.

The decree contained certain other findings and adjudications which need not be set forth herein.

But as any net profits which might be ascertained to exist would be claimed by the Securities Company and by John McDonald Henderson, as trustee in bankruptcy in Great Britain of Bright, and as 20 per cent. of such of the net profits as belonged to Bright were likewise claimed by McKelvey, the master was directed to report upon these various and conflicting rights. He was to report whether the interest in the concession received from the Railway Company from Bright was of any net value. And he was to report what obligations the Railway Company had to assume or was reasonably justified in assuming in order to obtain an unincumbered title to the concession.

The master made a most careful and painstaking investigation of the subject submitted to him. On the coming in of his report the cause was further heard before Judge Mayer, who approved and confirmed the report in all respects. A decree was entered by him on October 30, 1917. It adjudged that the concession had no net value after deducting the obligations the Railway Company had to assume or was reasonably justified in assuming in order to obtain the benefit of the concession and to secure an unincumbered title. The receiver was ordered to deliver to the Railway Company the shares of preferred and common stock and the debenture bonds issued by it, and to the Construction Company the shares of stock issued by it, all of which were in his hands. It also adjudged that the Railway Company was entitled as against the Securities Company and the two Brights to the participation in what is known as the "Johnson Syndicate" aggregating $64,200, and the receiver was directed to deliver to the Railway Company any and all documents in his hands representing the said syndicate participation. It further adjudged that the Railway Company was entitled to the delivery to it from the defendant Bright and the Securities Company of 374 debenture bonds of the Railway Company, and of 2,000 shares of preferred stock and 3,110 shares of common stock which had been heretofore delivered to them, and they were ordered to deliver the same forthwith to the Railway Company.

The Railway Company was also adjudged to be entitled to 150 debenture

bonds then in the hands of the Construction Company, and to 1,000 shares of preferred stock of the Railway Company then in the hands of Antonio Maria Rodriguez, and to debenture bonds of the Railway Company of the par value of $8,000 then held by J. A. Barbosa Caravia, and to certificates for the common stock of the Railway Company of the par value of $98,000 then held by the Castro interests, and it was decreed that all of these should be delivered to the Railway Company.

Herbert H. Gibbs, of New York City, for appellant.

O'Gorman, Battle & Vandiver, of New York City, for appellee John Jay McKelvey.

Murray, Prentice & Howland, of New York City, for appellees Pan-American Transcontinental Ry. Co. and National Ry. Const. Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The complainant brought this suit for an accounting of the profits realized by Bright from the sale which Bright made of a railroad concession granted by the government of Uruguay to one Juan Jose Castro, the profits being realizable from or out of certain securities delivered by the Railway Company and the Construction Company to the Securities Company under contracts existing between them. The complainant alleges that under his agreement with Bright he is entitled to receive 30 per cent. of the profits. District Judge Augustus Hand was satisfied that the complainant was entitled to 30 per cent. of any net profits which belonged to Bright as a result of his negotiating the concession. Under the decree which has been entered, the complainant receives nothing, as the court has found that the concession which Bright caused to be transferred to the Railway Company had no value and has directed that the securities which were issued therefor should be returned to the Railway Company and to the Construction Company by which they were issued. And the contracts between those corporations and the Securities Company, and under which the securities were issued, were directed to be rescinded and canceled in accordance with the prayer of the cross-bills.

The Securities Company has taken an appeal from the orders and decrees which have been entered. and we are presented with a prolix record of 5 printed volumes containing over 3,000 pages, with 316 different assignments of error. The thirty-eighth assignment of error. is as follows:

"That the court erred in finding in the interlocutory decree that this court has jurisdiction of this case, of the subject-matter thereof, and of the parties hereto." ·

We shall therefore proceed at once to inquire whether the court had jurisdiction. The Securities Company and the two Brights each appeared specially under protest for no other purpose than to plead to the jurisdiction. The plea of each declared that—

"The court has no jurisdiction because the action is not one to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon title to real or personal property within the Southern District of New York, and defendant Charles Bright is not a resident of the state of New York, and was not served ·within the Southern District of New York."

The answers interposed by the other defendants all asserted that the court was without jurisdiction. The question was heard before Judge Coxe, who overruled the objection and stated that, while he had some doubt as to the jurisdiction of the court, he was not sufficiently convinced to determine the question adversely to the complainant upon the papers then before the court. Later another motion was made to dismiss the complaint for want of jurisdiction. This time it was alleged that it was apparent from the bill that the jurisdiction of the court must be founded only on the fact that the action was between citizens of different states, and that the required diversity of citizenship did not exist. This motion was denied by Judge Holt.

[1] The jurisdiction of the court does not depend upon diversity of citizenship, the complainant not being a citizen of the United States. The complainant being an alien he is by virtue of that fact entitled to sue in a federal court one who is a citizen of this country. Section 24 of the Judicial Code (Comp. St. § 991) expressly provides that the District Courts shall have original jurisdiction of all suits of a civil nature at common law or in equity between citizens of a state and foreign states, citizens or subjects. So that the alienage of a plaintiff of itself gives jurisdiction to a court of the United States as against a citizen. Katalla Co. v. Rones, 186 Fed. 30, 108 C. C. A. 132; Suravitz v. Pristasz, 201 Fed. 335, 119 C. C. A. 537; Eldorado Coal & Mining Co. v. Mariotti, 215 Fed. 51, 131 C. C. A. 359. And if an alien begins his suit in a state court against a citizen, the latter, it has been held, may remove it into a federal court. Barlow v. Chicago Ry. Co. (C. C.) 164 Fed. 765; Stalker v. Pullman Co. (C. C.) 81 Fed. 989; Katalla Co. v. Rones, supra.

[2] In Lehigh Valley Coal Co. v. Washko, 231 Fed. 42, 145 C. C. A. 230, this court held that an alien can maintain a suit in the federal courts against a citizen only in the district of his residence unless defendant waives his privilege to be sued only in such district. And such we understand to be the well-established law. Galveston, etc., R. Co. v. Gonzales, 151 U. S. 496, 14 Sup. Ct. 401, 38 L. Ed. 248; Colosino v. Pittsburgh & L. E. R. Co. (D. C.) 210 Fed. 550. So a corporation cannot without its consent be sued by an alien in any district out of the state where it is incorporated, and if there is more than one district in such state then the suit should be brought in that district in which it has its headquarters and general offices. Galveston, etc., R. Co. v. Gonzales, supra; Lehigh Valley Coal Co. v. Washko, supra; Vitkus v. Clyde Steamship Co. (D. C.) 232 Fed. 288, 292; Best v. Great Northern Ry. Co. (D. C.) 243 Fed. 789. The defendant Bright was not at the time this suit was instituted a resident of the Southern District of New York in which the suit was commenced, and he was not served in the district. He appeared in the suit to object to the jurisdiction, and after his plea to the jurisdiction was overruled he put in an answer. But unlike some of the other defendants he filed no cross-bill and asked for no affirmative relief. In his answer he again insisted on the want of jurisdiction and stated that he made answer "without waiving any objections which he may have to the jurisdiction of the court." Then in the first, second, and third paragraphs of the answer he specifically

declared that the court was without jurisdiction. The third paragraph reads as follows:

"Third. That the court has no jurisdiction because the action is not one to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon title to real or personal property within the Southern District of New York, and this defendant is not a resident of the state of New York, and was not served within the Southern District of New York."

[3] In the federal courts if a defendant appears specially for the single purpose of objecting to the jurisdiction and his objection is overruled and he excepts to the overruling thereof, and then pleads to the merits, he is not considered as waiving or abandoning his objection to the illegality of the proceeding, but may raise the question on writ of error in the appellate court. Southern Pacific Co. v. Denton, 146 U. S. 202, 206, 13 Sup. Ct. 44, 36 L. Ed. 942; Mexican Central Ry. v. Pinkney, 149 U. S. 194, 209, 13 Sup. Ct. 859, 37 L. Ed. 699; Goldey v. Morning News, 156 U. S. 518, 15 Sup. Ct. 559, 39 L. Ed. 517; Davis v. C., C., C. & St. Louis Ry. Co., 217 U. S. 157, 174, 30 Sup. Ct. 463, 54 L. Ed. 708; Western Indemnity Co. v. Rupp, 235 U. S. 261, 272, 35 Sup. Ct 37, 59 L. Ed. 220. We do not think the defendant Bright by his answer waived his right to object to being sued by an alien in a district in which he did not at the time reside. In his sworn answer he alleged as follows:

"This defendant admits that he was at all the times mentioned in the bill as amended, and still is, a citizen of the United States, but he denies that he is a citizen of the state of New York, and alleges that he has been and still is domiciled in the city of Buenos Aires, republic of Argentine, South America, and by order of the Commercial Judge is a duly registered merchant in the register of Commerce of said city in good standing, where he is still carrying on business as a merchant, as the complainant well knew. That he is now in the city of New York and within the Southern District of New York."

[4] But this makes it necessary for us to inquire further, for the federal courts are authorized to assume jurisdiction in certain cases notwithstanding the fact that a defendant is not an inhabitant of the district and has not been served in the district and has not voluntarily appeared. Section 57 of the Judicial Code (Comp. St. § 1039), which is found in the margin,[1] authorizes a suit to be commenced in any Dis-

---

[1] "Sec. 57. When in any suit commenced in any District Court of the United States to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to real or personal property within the district where such suit is brought, one or more of the defendants therein shall not be an inhabitant of or found within the said district, or shall not voluntarily appear thereto, it shall be lawful for the court to make an order directing such absent defendant or defendants to appear, plead, answer, or demur by a day certain to be designated, which order shall be served on such absent defendant or defendants, if practicable, wherever found, and also upon the person or persons in possession or charge of said property, if any there be; or where such personal service upon such absent defendant or defendants is not practicable, such order shall be published in such manner as the court may direct, not less than once a week for six consecutive weeks. In case such absent defendant shall not appear, plead, answer, or demur within the time so limited, or within some further time, to be allowed by the court, in its discretion, and upon proof of the service or publication of said

trict Court of the United States to enforce any legal or equitable lien upon or claim to real or personal property within the district against one who is not an inhabitant of or found within the district or does not voluntarily appear. So that the question arises whether the claim which the complainant asserts relates to property which is within the Southern District of New York.

This section of the Judicial Code is a re-enactment of section 8 of the Act of March 3, 1875. The courts in construing the statute have said in a number of cases that an act which undertakes to give to courts jurisdiction over nonresidents, who do not come within the district for purposes of residence or business should be strictly construed and not enlarged by liberal construction. Woolridge v. McKenna (C. C.) 8 Fed. 650; Batt v. Proctor (C. C.) 45 Fed. 515; Non-Magnetic Watch Co. v. Association Horlogere Swisse of Geneve (C. C.) 44 Fed. 6. In Consolidated Interstate Callahan Mining Co. v. Callahan Mining Co. (D. C.) 228 Fed. 528, 530, the court was of the opinion that the statute should receive a liberal construction. In Non-Magnetic Watch Co. v. Association Horlogere Swisse of Geneve, supra, speaking of this provision of the statute, Judge Lacombe said:

"Statutes which undertake to give to courts jurisdiction over nonresidents, who do not come within the district for purposes either of residence or business, should not be enlarged by too liberal construction."

And he declared that he could not satisfy himself that the section was intended to cover such incorporal and intangible property as a patent right, possession of which must of necessity be ideal, not actual, and which could not be seized or sold under an execution. In De Ganay v. Lederer, 250 U. S. 376, 39 Sup. Ct. 524, 63 L. Ed. 1042, the court declared that stocks and bonds are often regarded as "property" and not simply evidence of the ownership of the interests which are property. The court said that—

"Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them. To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages, and certificates of stock are regarded as property."

---

order and of the performance of the directions contained in the same, it shall be lawful for the court to entertain jurisdiction, and proceed to the hearing and adjudication of such suit in the same manner as if such absent defendant had been served with process within the said district; but said adjudication shall, as regards said absent defendant or defendants without appearance, affect only the property which shall have been the subject of the suit and under the jurisdiction of the court therein, within such district; and when a part of the said real or personal property against which such proceedings shall be taken shall be within another district, but within the same state, such suit may be brought in either district in said state; Provided, however, that any defendant or defendants not actually personally notified as above provided may, at any time within one year after final judgment in any suit mentioned in this section, enter his appearance in said suit in said District Court, and thereupon the said court shall make an order setting aside the judgment therein and permitting said defendant or defendants to plead therein on payment by him or them of such costs as the court shall deem just; and thereupon said suit shall be proceeded with to final judgment according to law." 36 Stat. L. 1102.

And we have no doubt that stocks and bonds are property within the meaning of section 57 of the Judicial Code.

In the case now before the court there are in the district in which the suit is brought certificates of shares of stock and debenture bonds issued by the Railway Company and by the Construction Company, both of which were organized, as already stated, under the laws of Maine.

[5] Shares of stock are not chattels but are in the nature of choses in action. They are intangible incorporeal personal property. They may have a situs for some purposes at the domicile of the owner, and for some purposes they may have one at the domicile of the corporation. It makes no difference in determining such situs where the certificate of stock may physically be, since it is merely evidence of title to the stock. 14 C. J. 390. Cook on Corporations (7th Ed.) vol. 1, p. 61, states that—

"Legal proceedings against the stock may be initiated at the domicile of the corporation. A claimant of stock in a corporation may institute suit at the place where the company is incorporated for the purpose of obtaining possession of the stock, even though the holders of the stock are nonresidents and are brought into the case only by publication and substituted service. The court acquires jurisdiction over the defendants."

The same writer, in volume 2, § 363, declares that it is well established that shares of stock may have a situs at two separate places at the same time. That for purposes of taxation, and for a few other purposes, shares of stock follow the domicile of the shareholder. But that for purposes of suits concerning the title to the stock, for attachment and execution, and for various other similar purposes, the situs is at the place where the corporation exists.

An important distinction exists between shares of stock and certificates for the shares, the certificates being mere evidence of title. Winslow v. Fletcher, 53 Conn. 390, 4 Atl. 250, 55 Am. Rep. 122. And it has been held that shares can have no situs in a state merely because a corporation does business in a state other than the one in which it is incorporated. Ashley v. Quintard (C. C.) 90 Fed. 84; Plimpton v. Bigelow, 93 N. Y. 592; New Jersey Sheep, etc., Co. v. Traders' Deposit Bank, 104 Ky. 90, 46 S. W. 677.

And while ordinarily shares of stock have their situs either at the domicile of the corporation or at the domicile of the shareholder, it is possible that under some circumstances they may have their situs elsewhere. In Lockwood v. United States Steel Corporation, 209 N. Y. 375, 103 N. E. 697, L. R. A. 1915C, 471, the domicile of the corporation was in New Jersey and the domicile of the deceased shareholder was in Bermuda. But the New Jersey corporation maintained an office in New York for the purpose of receiving certificates of its stock for transfer upon its books and for the delivery of new certificates when such transfers had been made. It was held in a unanimous opinion, reversing the Appellate Division, that the foreign corporation had a domicile in New York for transfer purposes.

In Re Clark, L. R. (1 Ch. 1904) 296, the will of a testator domiciled in England bequeathed all his personal estate in the United Kingdom to his home trustee and all his personal estate in South Africa to his

foreign trustee. He was possessed of shares in South African mining companies, which had an office in London where a duplicate register of shares was kept and shares could be transferred. The court had to determine the locality of the personal estate. The actual effective transfer could be done equally effectually in South Africa or in England. And the court held that where the certificates of the shares were in England they passed under the gift of property in South Africa. No reference was made to the doctrine that personal property is deemed to follow the domicile of the owner.

In the instant case while the corporations issuing this stock were organized under the laws of the state of Maine, each maintains its principal office in the city of New York in the Southern District in which this suit was brought. The certificates of the stock being within the district and capable of transfer within the district on the books of the corporations at their principal offices therein, the securities constitute property within the district within the meaning of section 57 of the Judicial Code.

In Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 20 Sup. Ct. 559, 44 L. Ed. 647, a suit was brought in a Circuit Court of the United States for the Western District of Michigan against a mining corporation organized under the laws of that state and against certain individual defendants holding shares of stock in that corporation and being citizens of the state of Massachusetts. The suit was brought by plaintiffs living in another state. They sought a decree removing a cloud upon their title to the stock. They alleged in their bill that the shares of stock in the defendant company constituted personal property "and its location is where the company is incorporated and nowhere else." The Supreme Court reversing the court below held that the locus in quo of the stock was in Michigan and in the district in which the suit was brought within the meaning of the act of Congress now under consideration. We think that case is distinguishable from this in view of the fact that in this case the corporations maintained their principal office, not in the state in which they were incorporated, but in the district in New York in which the suit was brought and where its books are kept and transfers made.

In Blake v. Foreman Bros. Banking Company (D. C.) 218 Fed. 264, District Judge Carpenter held that certificates of stock in a foreign corporation properly indorsed and delivered as security to a trustee with power of sale in case of default are "property" having a situs at the place of business of the trustee under section 57.

[6] Assuming then that there is property within the district within the meaning of section 57, the question remains whether the complainant has such an interest in it as can be asserted by him in the suit which he has brought. Is the suit one to enforce a legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon title to real or personal property within the district? If the suit is not one to enforce a lien upon or claim to property within the district, or to remove a cloud upon the title to such property, the court was without jurisdiction to proceed.

In Shainwald v. Lewis (D. C.) 5 Fed. 510, the court construed the language of the section now under consideration, and it was declared that—

The section "was only intended to reach those suits in equity in which it was sought to enforce some pre-existing lien or claim, legal or equitable, upon or to some specific property, real or personal, and not cases in which it is sought to reach and appropriate the general property of a defendant to the payment of his debts. By the words 'legal or equitable lien or claim against real or personal property,' Congress intended to reach every case in which there should be any sort of charge upon a specific piece of property, capable of being enforced by a court of equity. This is manifest to my mind from the section as it stands; but when we look to the Act of March 3, 1875, which was evidently intended as a substitute for section 738, all doubt vanishes. Such expressions as were obscure in the latter section are by the former made clear."

And the doctrine announced in the above case is followed in the subsequent decisions. See Dormitzer v. Illinois & St. Louis Bridge Co. (C. C.) 6 Fed. 217; Jones v. Gould, 149 Fed. 153, 80 C. C. A. 1; Wabash Railroad Co. v. West Side Belt Railroad Co. (D. C.) 235 Fed. 645.

[7] The term "lien" is the right which a creditor has to obtain satisfaction of a debt or duty out of a specified res which is owned by another. It is a charge or incumbrance upon specific property which is security for the payment of money or the performance of some duty. See Hotchkiss v. National City Bank of New York (D. C.) 200 Fed. 287, 291; In re National Cash Register Co., 174 Fed. 579, 581, 98 C. C. A. 425; In re Maher (D. C.) 169 Fed. 997, 999; Hardin v. Kelley, 144 Fed. 353, 354, 75 C. C. A. 355; In re Bennett, 153 Fed. 673, 690, 82 C. C. A. 531. Unless there is a specified res there can be no lien. It certainly will not be said that any legal lien exists in the complainant. And we are satisfied that no equitable lien is possessed by him. Judge Story, in his Equity Jurisprudence (volume 2, § 1215), refers to "that class of implied trusts, arising from what are properly called equitable liens." And he says that a lien is not, strictly speaking, either a jus in re, or a jus ad rem; that "it is not a property in the thing itself, nor does it constitute a right of action for the thing. It more properly constitutes a charge upon the thing." And in section 1217 he says that equitable liens arise from constructive trusts. The instances are numerous in which courts of equity acting upon the theory of an implied trust convert a party who has received property which he cannot conscientiously withhold from another into a constructive trustee, making the property itself subservient to the proper purposes of recompense by way of equitable trust or lien. I Fonbl. Eq. B. 1, c. 2, § 2, note K. A lien based upon the fundamental maxims of equity may be implied and declared by a court of chancery out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. If one enters into a valid executory agreement whereby he indicates his intention to make some particular property a security for a debt, or promises to convey, or assign or transfer the property as security, the courts of equity hold that the mere agreement creates an equitable lien which is enforceable against the property not only in the hands of the promisor but in those

of his voluntary assignees and purchasers or incumbrances with notice. The doctrine rests upon the maxim that equity regards as done that which ought to be done. Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865; Ketcham v. St. Louis, 101 U. S. 306, 25 L. Ed. 999; Farmers' Loan & Trust Co. v. Penn. Plate Glass Co., 103 Fed. 132, 151, 152, 43 C. C. A. 114; 56 L. R. A. 710; Pinch v. Anthony, 8 Allen (Mass.), 536; Pomeroy's Eq. Jur., vol. 3, § 1235. And in Legard v. Hodges, 1 Vesey, Jr., 478, Lord Thurlow said:

"I take this to be a universal maxim, that wherever persons agree concerning any particular subject, that, in a court of equity, as against the party himself, and any claiming under him voluntarily, or with notice, raised a trust. These persons have so claimed; and therefore, this is a pure trust estate."

[8] In the case under consideration it was agreed between the defendant Bright and the complainant that the latter should render certain services to Bright in carrying through the enterprise and that the complainant should have 30 per cent. of the profits arising from the enterprise. The written agreement which appears in the answers gives the complainant "thirty per cent. (30%) of the net profits that you (Bright) may make in negotiating the said concession, after paying out or deducting all expenses, obligations or commissions, or other sums whatsoever that you may incur in connection with the said business, and a further sum of £5,000 to be deducted for your personal expenses." But there was never any agreement to give the complainant a lien on moneys paid or on stocks or bonds delivered to Bright and out of which the profits were to be realized. Bright cannot be regarded as a constructive trustee holding such moneys and stocks and bonds in trust for the complainant. He was at liberty to use the moneys and stocks and bonds as he saw fit and could pass an unincumbered title to one with notice. He was simply a debtor to the complainant for 30 per cent. of the net profits after all proper deductions had been made. "Profit" is the gain made in a business transaction and represents the excess of acquisition over expenditure. Providence Rubber Co. v. Goodyear, 9 Wall. 788, 804, 19 L. Ed. 566; People v. Niagara County Supervisors, 4 Hill (N. Y.) 20, 23; Mundy v. Van Hoose, 104 Ga. 292, 30 S. E. 783; Prince v. Lamb, 128 Cal. 120, 60 Pac. 689; Maryland Ice Co. v. Arctic Ice Mach. Mfg. Co., 79 Md. 103, 29 Atl. 69; Mitchell v. Chicago, Rock Island and P. R. Co., 138 Iowa, 283, 114 N. W. 622. Profits and net profits usually mean the same thing. Thomas v. Columbia Phonograph Co., 144 Wis. 470, 129 N. W. 522. There is no reason to doubt that the profits out of which the complainant in this case was to be paid his 30 per cent. meant net profits. We cannot see, therefore, that Vidal had any lien upon any specific sum of money or upon any specific security delivered to Bright or to the Security Company on his behalf.

[9] It remains to inquire, if Vidal had no lien, whether he had such a "claim" to property within the district as was sufficient to justify the court in assuming jurisdiction under the section under consideration. The term "claim," as used in the section, is the right to lay claim to a

specific property which is in another's possession. Webster's New International Dictionary defines the word as follows:

"2. A right to claim something; a *title* to any debt, privilege, or other thing in the possession of another; also a *title* to anything which another should give, or concede to, or confer on, the claimant.

The Century Dictionary defines it as follows:

"3. A right to claim or demand; *a just title* to something in one's own possession or in the possession or at the disposal of another."

The legal definition given by Jacobs is:

"A challenge of interest in anything that is in the possession of another, or at least out of a man's own possession."

As quoted by Jacobs from Plowden, giving the definition of Chief Justice Dyer, it is "a challenge of the ownership or property that one hath not in possession but which is detained from him by wrong." In Silliman v. Eddy, 8 How. Prac. (N. Y.), 122, 123, the word "claim" is defined to mean "a demand of anything that is in the possession of another." The term "claim" must be construed in the light of the context, and so construed it cannot be understood as giving to a mere general creditor a right to sue a nonresident in any district in which he can find any property belonging to his debtor when he himself has no lien and no claim of ownership in the property to assert. It has been held that where the plaintiff has no special claim against the property, or any right in or to it different from any other general creditor of the defendant, or any one having a right to sue the defendant in tort, he cannot use the existence of the property within the district as a basis for bringing his suit within it against a defendant who is not an inhabitant of the district or found in the district or does not voluntarily appear therein. George v. Tennessee Coal, Iron & R. Co. (C. C.) 184 Fed. 951.

In Ladew v. Tennessee Copper Co. (C. C.) 179 Fed. 245, 251, Judge Sanford, construing section 57 and the words "claim to * * * property," said that—

They "are evidently used in contrast to liens or incumbrances upon property and are the only words in the section under which a claim to the direct ownership of property may be included, these words relate only to claims made to the property in the nature of an assertion of ownership or proprietary interest, or other direct right or claim to the property itself, such, for example, as the claim of ownership of an undivided interest in the property upon which a suit for partition may be based, * * * and do not include the assertion of a right which is not based upon an interest in the property itself, but seeks merely to enforce a restriction which the law imposes upon the owner of the property in reference to its proper use."

And it cannot be said that Vidal asserts any claim in the nature of ownership or proprietary interest in the property which is within the district.

In Lengel v. American Smelting & Refining Co. (C. C.) 110 Fed. 19, a stockholder who resided in Pennsylvania sued in a Circuit Court of the United States in New Jersey to restrain the enforcement of a contract by which the New Jersey corporation sold certain of its stock to

its codefendants who were citizens of New York. In dismissing the bill Circuit Judge Gray said that an "ingenious" argument was made in favor of jurisdiction under section 738 of the Revised Statutes (section 57 of the Judicial Code) on the ground that the subject-matter of the suit was the capital stock of the New Jersey corporation, and as such must be regarded as property within the district." He continued:

"It is very clear that the present suit is not brought to 'enforce any legal or equitable lien or claim against real or personal property,' within the meaning of this statute. * * * The enforcement of an antecedent existing lien held by the complainant is not the subject-matter of this suit."

[10] Neither can it be said that the suit is one to remove an incumbrance, or lien, or cloud upon the title to real or personal property. One can only bring a suit to remove "an incumbrance, or lien, or cloud upon the title" to property to which he is himself entitled. And a mere general creditor who has not reduced his claim to judgment has no such interest in the property of his debtor as brings him within this provision.

In Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358, the suit was in equity to subject to the payment of a debt alleged to be due and owing to the complainants by the defendant, certain property of the defendant within the district. The equitable suit was brought to enforce the application of the property to the purposes intended by the contract of the parties. The court in holding that the suit could not be maintained said:

"In all cases where a court of equity interferes to aid the enforcement of a remedy at law, there must be an acknowledged debt, or one established by a judgment rendered, accompanied by a right to the appropriation of the property of the debtor for its payment, or, to speak with greater accuracy, there must be, in addition to such acknowledged or established debt, an interest in the property or a lien thereon created by contract or by some distinct legal proceeding."

And in the case now before us the suit is also in equity to secure the payment of a debt, although in this suit and in aid thereof an accounting and discovery is asked. And in this suit, as in that, the suit is to enforce the application of property within the district to the purposes intended by the contract of the parties. But in this case, as in that, the complainant has "no interest in the property and no lien thereon."

The conclusion we have reached is that the suit is one to enforce the payment of a debt and for an accounting, and that the facts alleged do not show a lien or a claim of ownership in specific property, and therefore is not within section 57 of the Judicial Code. And that as the suit was not within the section the court was without jurisdiction over Bright with whom Vidal made the contract which is the basis of the suit and who is a necessary party, and who is not an inhabitant of the district and has not been served, and has not voluntarily appeared.

This conclusion makes it unnecessary to consider a motion to dismiss the appeal for a reason now to be mentioned. Upon the argument of the appeal in this court a motion was made for an order dismissing the appeal on the ground that the bonds and shares of stock involved in the litigation had become valueless, and that the appeal therefore

brought up only a moot question. We reserved our consideration of that motion and allowed the argument of the appeal to proceed with the understanding that we would dispose of the question thus raised after we had examined into the whole case.

[11, 12] We have no doubt that it is the duty of a court to dismiss an appeal and not proceed to formal judgment if pending the appeal an event occurs without any fault of the defendant which renders it impossible for the court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever. Mills v. Green, 159 U. S. 651, 16 Sup. Ct. 132, 40 L. Ed. 293; Board of Flour Inspectors v. Glover, 160 U. S. 170, 16 Sup. Ct. 321, 40 L. Ed. 382; Kimball v. Kimball, 174 U. S. 158, 162, 19 Sup. Ct. 639, 43 L. Ed. 932. And the cases show that facts which have occurred since the decree and which make the question at issue moot and which are outside of the record may be proved by extrinsic evidence. See Lord v. Veazie, 8 How. 251, 12 L. Ed. 1067; Dakota County v. Glidden, 113 U. S. 222, 225, 226, 5 Sup. Ct. 428, 28 L. Ed. 98; California v. San Pablo & Tulare Railroad, 149 U. S. 308, 13 Sup. Ct. 876, 37 L. Ed. 747; Ridge v. Manker, 132 Fed. 599, 601, 67 C. C. A. 596. If we had concluded that the court had jurisdiction of the case it might have been our duty to have dismissed the appeal if convinced that the property within the district had become valueless and that the question presented was moot. But it is unnecessary now to enter upon a consideration of that phase of the matter.

The decrees appealed from are reversed, and the case is remanded, with directions to dismiss the bill of complaint and the cross-bills of the Pan-American Transcontinental Railway Company and the National Railway Construction Company for want of jurisdiction. Costs of the appeal to be taxed against John J. McKelvey and the Railway and Construction Companies.

HOUGH, Circuit Judge, dissents.

## On Petition for Rehearing.

PER CURIAM. We dismissed the original bill in this case because the plaintiff had no lien upon or claim to the securities mentioned under section 57 of the Judicial Code, and also because the defendant Bright was not an inhabitant of the Southern district of New York or served therein. Following the general rule that a cross-bill falls with the original bill, we also dismissed the counterclaims which under equity rules 30 (201 Fed. v, 118 C. C. A. v) and 31 (198 Fed. xxvii, 115 C. C. A. xxvii), are substituted for cross-bills of the defendant Pan-American Transcontinental Company and of defendant National Railway Construction Company against defendant Charles Bright and defendant South American Securities Company. The Securities Company only has appealed.

[13, 14] As the counterclaims set up causes of action within the jurisdiction of the court as a court of equity, and within its jurisdiction as a federal court because of the citizenship of the parties, except in the case of the defendant Bright, they should not have been dis-

missed, but should have been treated as original bills upon the dismissal of the original bill. Bates on Federal Equity Procedure, § 386; Markell v. Kasson (C. C.) 31 Fed. 104; Jesup v. Illinois Central R. R. Co. (C. C.) 43 Fed. Rep. 483; San Diego Flume Co. v. Souther, 90 Fed. 164, 32 C. C. A. 548. The defendant Bright, however, although a citizen of the United States, not being a citizen of any state, because he has been domiciled and engaged in business at Buenos Aires, Argentina, for many years, the counterclaims were properly dismissed as to him; the jurisdiction of the court being limited to controversies between citizens of different states.

[15] We agree with the court below that the contracts between the Securities Company and the Railway Company and the Construction Company should be canceled and rescinded, and all securities delivered thereunder to the Securities Company, in its possession or in possession of the receiver, be returned to those companies, respectively, and that the counterclaim of the Securities Company against John J. McKelvey and Alpheus H. Favour, individually and as copartners, for $500,000 damages, should be dismissed, and that the amended bill of complaint be dismissed as to the defendants Frederick R. Bright, William F. Piper, Charles R. Demarest, Edward I. Thompson, Ralph H. McKelvey, and Warren G. Thompson. But the decree must be reversed because the original bill should have been dismissed, with costs to defendant Charles Bright against Vidal, and the counterclaims of the Railway Company and Construction Company against defendant Charles Bright should also have been dismissed, with costs of both courts, payable one-half by the Railway Company and one-half by the Construction Company, and the affirmative relief before mentioned on the counterclaims should have been given to the Railway Company and the Construction Company, with costs of both courts against the Securities Company, and, finally, the rights of persons not parties or persons not within the jurisdiction of the court should not have been determined.

Decree reversed, and the court below is directed to enter a decree in accordance with this opinion, making such provisions for payment of the fees of the special master, receiver, and stenographers as to it shall seem proper.