OLD SECURITY LIFE INSURANCE COMPANY, et al., Plaintiffs-Appellees,

v.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST CO. OF CHICAGO, Defendant-Appellant.

Robert J. BAKER, et al., As Trustees of Central States, Southeast and Southwest Areas Health and Welfare Fund, Intervening Plaintiffs-Appellees,

v.

OLD SECURITY LIFE INSURANCE COMPANY, et al., Intervening Defendants-Appellants,

and

Continental Illinois National Bank and Trust Co. of Chicago, Intervening Defendant-Appellant.

Nos. 82–3067, 82–3068.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1984.

Decided July 24, 1984.

Rehearing and Rehearing In Banc Denied Aug. 30, 1984.

Gary M. Elden, Reuben & Proctor, Chicago, Ill., for plaintiffs-appellees.

James L. Coghlan, Coghlan, Joyce, Nellis & Kelly, Chicago, Ill., for intervening plaintiffs-appellees.

Stephen M. Shapiro, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellant.

Before ESCHBACH and FLAUM, Circuit Judges, and SWYGERT, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

Old Security Life Insurance Company ("Old Security") brought this diversity action against Continental Illinois National Bank and Trust Company ("Continental") to recover $1.5 million allegedly transferred by the bank from Old Security's account without authorization. The Trustees of the Central States, Southeast and Southwest Areas Health and Welfare Fund

("Fund") intervened. The Fund alleged that the money in the account consisted of premiums obtained from the Fund by Old Security through a conspiracy to defraud. Accordingly, the Fund claimed a superior right to any recovery the insurance company might ultimately obtain against the bank.

The action was bifurcated, and Old Security prevailed in its action against Continental. Judgment was entered for the insurance company, but execution on the judgment was stayed pending adjudication of the rights of the intervenor. Trial was then had before a second judge on the Fund's claim, and the Fund prevailed. The district court vacated the previous judgment and entered judgment against the Bank and in favor of the Fund.

We have determined that the district court correctly decided the issues in this complex litigation. However, because we have determined that the court incorrectly vacated its judgment in favor of the insurance company, we remand the case for reinstatement of the judgment in favor of Old Security, and entry of judgment in favor of the Fund.

## I.

### A. *The Fund v. Old Security*

Joseph Hauser was an insurance promoter in the business of soliciting and obtaining labor union insurance contracts for companies he owned. Hauser's reputation in the insurance industry was unsavory.[1] In 1974, he gained control of Florida-based Farmers National Life Insurance Company ("Farmers National"), and hired two actuaries, Brian Kavanagh and John Boden, to run the company. Farmers National was licensed in only six southern states, and its principals intended to write labor group policies in states outside the areas covered by their licenses. In order to accomplish

that goal, Farmers National entered into an agreement with Old Security in March 1975, under which Farmers National would produce union group insurance contracts and write the business on Old Security policies. Old Security would receive a 2% fee for allowing this arrangement, and Farmers National would bear 100% of the risk and control 98% of the premiums.[2]

Shortly after concluding the Farmers National-Old Security agreement ("Farmers agreement"), Hauser, Kavanagh and Boden were introduced to Len Teeuws of Tolley International Corporation ("Tolley International"). Tolley International was a financial consulting firm for several labor union insurance funds. Teeuws was apparently quite helpful in obtaining insurance contracts for Old Security under the Farmers agreement. For instance, bid specifications for one Indiana union insurance fund ("Indiana Fund") were circulated under Tolley International's name. They were, in fact, prepared in part by John Boden of Farmers National, who tailored the recommendations to the Old Security insurance plan that Farmers National was selling.[3] Teeuws also submitted a report to a Massachusetts labor fund detailing recommendations for group insurance. This report was prepared in part by Boden, who also prepared Old Security's bid for the contract. Both of these labor groups awarded insurance contracts to Old Security.

In 1975, the Central States, Southeast and Southwest Areas Health and Welfare Fund ("Fund") decided to terminate its contract for group insurance and, for the first time in twenty years, to award the life and disability coverage through competitive bidding. Executive Director Daniel Shannon had direct responsibility for insurance placement, and he assigned control of the bidding to Teeuws, the Fund's insurance advisor. Teeuws was to select companies

---

1. Beginning in 1974, Hauser came under investigation by the United States Department of Justice. The investigation led to Hauser being charged in an eight-count indictment with violations of 18 U.S.C. § 1954 (offering bribes to influence employee benefit plans). In March, 1977, he was convicted on four counts.

2. A contract whereby one insurance company allows another to use its name for a fee is called a fronting arrangement.

3. The practice of tailoring bid specifications to favor a certain insurer is known as "wiring the business."

which would be invited to bid, prepare bid specifications, analyze proposals made by insurance companies, and recommend an insurer for award of the contract by the trustees. One of the conditions of Teeuws's contract was that he would not recommend an insurer from whom he was receiving commissions. At the time Teeuws accepted the Fund assignment, he was receiving commissions from Old Security in connection with the Indiana Fund contract.

It is uncontested that Teeuws, Hauser, and Boden agreed that Teeuws would place Old Security on the bid list in exchange for Hauser's commitment to assist Teeuws in obtaining new union business.

By the end of 1975, Farmers National was insolvent and under investigation by the Florida Department of Insurance. The Miami newspapers published a series of articles describing the relationship between Hauser and the company. Lawrence Lee, an attorney for an Arizona union group, investigated Farmers National in connection with an Old Security-Farmers National proposal. He was told by the Florida insurance department that Farmers National was connected with Hauser, that it had been injected with questionable assets which were being investigated by the department, and that it had been fined $5,000 for failing to disclose both Hauser's ownership and a loan to one of its directors. Lee contacted Richard Halford, vice-president at Old Security in charge of union group insurance, and related the information he had received. Halford assured Lee that he was aware of Hauser's reputation, but that Hauser was no longer involved with Farmers National. Halford then called Kavanagh, who told him that Hauser had no official capacity with the company, and that the financial problems had been cleared up. Halford did not attempt to check the accuracy of Kavanagh's representations with the Florida Department of Insurance.

Hauser controlled a second company, Family Provider Life Insurance Company ("Family Provider"). In 1975, the company

had no business, no office, and assets of $50,000. Because of Farmers National's insolvency, Hauser decided to activate Family Provider, and its assets were increased to $250,000, the minimum required to conduct business in Arizona, where the company was licensed. In January 1976, Boden and Kavanagh met with Halford and Robert Barton, president of Old Security, to propose a new agreement between Old Security and Family Provider for the purpose of obtaining the Fund business. Both Barton and Halford considered Family Provider and Farmers National to be "synonymous" and believed that Kavanagh and Boden had the authority to speak for either company.[4]

Barton and Halford knew that Family Provider was a dormant company, and that its size would have precluded any consideration of it by the Fund. Nevertheless, they entered into an agreement with Family Provider whereby that company could direct the investment of 80% of the Fund's premiums, in return for Old Security allowing the business to be written on its policies. The Family Provider interests dictated the terms of the agreement because that company's principals had the contacts necessary to get Old Security on the Fund bid list. Both Kavanagh and Boden recalled that the Old Security officers were told that Hauser could deliver the Fund contract. While neither Boden nor Kavanagh identified the person at the Fund over whom Family Provider had influence, Barton testified:

> At the time the [Fund] case was proposed to Old Security, it was my understanding that one of the principals of Family Provider had an inside connection at the ... Fund that would enable Old Security's name to be put on the bid list .... They told us they would get a bid proposal, and they did. I think it was obvious they had some connection.

Barton testified that he may have considered Tolley International to be Family Provider's inside connection, but that in-

**4.** Kavanagh was president of Farmers National and vice-president of Family Provider. Boden was president of Family Provider and vice-president of Farmers National.

quiry about the identity of the insider "would have served no purpose."

Old Security's bid proposal on the Fund contract was prepared by Family Provider and reviewed by Halford. Teeuws had informed Family Provider that a 3% retention rate (profit percentage) would make Old Security competitive, and that rate was included on the original bid. Family Provider's interest was not revealed on the bid, nor was the fact that Old Security paid commissions to Teeuws in connection with the Indiana Fund contract. While the bids were pending, Halford received updated information on the progress of Old Security's proposal, and was told that Prudential Insurance Company was the top competitor. Teeuws informed Boden that Prudential's bid offered to pay interest on a portion of the premium reserves. Halford considered this information helpful. He authorized Family Provider to reduce the retention rate by up to one-half per cent if the Fund agreed to be responsible for claims processing.

At the meeting of the Fund trustees on April 30, Teeuws was asked for his evaluations. He replied that Old Security had the better proposal for a one-year contract, and Prudential was better for a long-term contract. Trustee Duffy asked Teeuws for his analysis of Old Security. Teeuws responded that the company was well-rated and capable of performing the contract. Teeuws never informed the trustees about his agreement with the Family Provider principals, or his previous dealings with that group. Nor did he inform them of Family Provider's relationship with Old Security, or his own receipt of commissions from that company. Trustee Spickerman asked Teeuws for his recommendation. Teeuws recommended Old Security, and three trustees testified that they relied on that recommendation to award Old Security the contract. The Fund's Executive Director, Daniel Shannon, testified that had he been aware of Teeuws's arrangement with Family Provider, or Old Security's

agreement with that company, he would have recommended that the contract not be awarded to Old Security. He further testified that had the trustees persisted in the face of such knowledge to award Old Security the contract, he would have reported them to the Department of Labor. Shannon also testified that had he known any of these agreements existed, he would have refused to deliver the first premium check. Three trustees testified that they would not have awarded the contract to Old Security if they had known of the arrangements.

B. *Old Security v. Continental Bank*

On May 10, Barton, Kavanagh and Boden met with representatives of the Fund. Barton informed the Fund that he had the letters necessary to open a premium account, and the Fund presented him with a $1,776,000 check for the initial premium deposit. A meeting with representatives from Continental had been scheduled for the afternoon. However, the meeting had to be postponed for two hours, and rather than have Barton reschedule his flight back to Old Security's home offices, Kavanagh offered to deliver the check and the accompanying documents[5] to the bank officials. Barton agreed.

Later that day, Kavanagh and Fund representatives met with Dennis Hughes of Continental. It was generally agreed that the premium money should be moved quickly from the initial account to some form of investment, and Kavanagh stated that Old Security would probably move the funds to other banks where it had investment accounts. Jason Doskow of the Fund suggested wire transfers as a method of transferring the money quickly, but Hughes stated that Continental would not be willing to transfer the money until it received signatory authorization from Old Security. However, Hughes stated that the money could be transferred earlier pursuant to the bank's "same name" policy, whereby funds could be moved between accounts of the same customer. Kavanagh

---

5. Kavanagh had been given several documents in connection with opening the account. The only one delivered to bank representatives was a corporate resolution which authorized the opening of an account, and listed the titles of Old Security officers who would be authorized to withdraw money.

told Hughes he would call the next day to arrange the transfer.

Hauser, Kavanagh, and Boden had previously agreed that the money would be transferred to an account over which Old Security had no control. Old Security had, at Family Provider's request, established a bank account over which Boden had signatory authority in the name of "Old Security for Family Provider" with the First National Bank of Arizona. Boden and Kavanagh met on May 11 and discussed moving the Fund money to this account. Accordingly, Kavanagh called Dennis Hughes and requested that $1,500,000 be transferred to Arizona, representing that the accounts were both in Old Security's name. Hughes complied.

That day, Barton asked Old Security's comptroller, Bonnie Bilbrey, to move the money in the Fund account into some form of interest-bearing certificate of deposit. Bilbrey called Continental, but was told that the account could not be located. On May 12 or 14, Bilbrey again called the Bank, and Hughes told him that the money had been transferred to Arizona pursuant to Kavanagh's instructions. Barton and Bilbrey informed Hughes that the transfer was unauthorized. The Old Security officers then called the Arizona bank, but were told that the transfer could not be reversed because the money had already been transferred to other accounts. Some time after May 12, Barton again called Continental and spoke to Leonard Sebesta, Old Security's usual representative at the bank. Barton repeated that the transfer was unauthorized.

Upon learning of the transfer, Barton immediately called Boden and Kavanagh, told them that the transfer was unauthorized, and demanded that the money be returned. Barton was told that the funds had been placed in an escrow account and could not be released without incurring a penalty. However, Kavanagh offered to deliver certain mortgages and notes to Old Security until such time as the funds could be returned.

Kavanagh twice delivered photocopies of mortgages and notes to Old Security, finally delivering the necessary documents for effecting a transfer of the mortgages, purportedly worth $2,200,000, on June 9. In fact, the mortgages had been released in March, a fact that Old Security finally discovered when it conducted a belated investigation of the mortgages' validity on August 30. The $1,500,000 from the account at Continental was never returned.

Old Security made a formal demand for the funds from Continental on August 22, 1976. It filed the instant action against Continental on September 29, 1976.

## II.

### *Old Security v. Continental Bank*

Continental contended in the district court that the $1,500,000 transfer was authorized, or, alternatively, that Old Security should be estopped from presenting its claim against the bank.[6] On appeal, the bank repeats these arguments, adding a new argument based on findings made by the district court judge in the second half of this bifurcated trial. We will examine each of Continental's contentions under Illinois law, which applies in this diversity action.

### A. *Express Authority*

Continental's first argument rests on a letter prepared by Old Security at John Boden's request authorizing him as a signatory on the account to be established at Continental. Continental reasons that if Boden were actually authorized to withdraw money from the account, he could delegate the task of calling in a transfer order to Kavanagh. The flaw in this reasoning, however, is that both Kavanagh and Boden admitted that they knew of Old Security's objections to any plan to move the money to another account. Barton of Old Security had discussed the issue of

---

**6.** Most of Continental's claims rest on Kavanagh's and Boden's agency status. There is no serious dispute that both of these men had acted as general agents for Old Security in the past under the Farmers National and Family Provider agreements.

who was to control the premium funds with Kavanagh immediately before the meeting with the Continental representatives on May 10. In that discussion, Kavanagh suggested that the funds be moved to another account, and Barton unambiguously replied that Old Security wanted the funds maintained in the proposed account at Continental, over which Old Security exercised control. An agent has no authority to act contrary to the known wishes and instructions of his principal. *See, e.g., Johnston v. Suckow,* 55 Ill.App.3d 277, 12 Ill.Dec. 846, 370 N.E.2d 650 (1977); *Restatement (Second) of Agency* § 33 (1957). Appellant cites cases which state that the course of dealing between the principal and his agent is relevant to a determination of whether a particular act is authorized. *See Rockford Life Insurance Co. v. Rios,* 128 Ill.App.2d 190, 261 N.E.2d 530 (1970); *Restatement (Second) of Agency* § 34 (1957). However, the course of dealing between the parties only becomes important when there is some disagreement over the scope of an actual authorization. Where, as here, both the principal and the agents acknowledge that a particular transaction was concluded against the known wishes of the principal, the parties' previous course of dealing is irrelevant.

### B. *Apparent Authority*

In order to establish that Kavanagh was apparently authorized to transfer the Fund premium money, Continental must show that some words or conduct on the part of Old Security led Continental reasonably to conclude that Kavanagh possessed such authority. *See, e.g., Lawcock v. United States Trotting Ass'n,* 55 Ill. App.2d 211, 216, 204 N.E.2d 802, 805 (1965); *Restatement (Second) of Agency* § 27 (1957). Because Continental agrees that Old Security had no direct contact with the bank representatives before the transfer, its argument is premised on the theory that Old Security made representations about Kavanagh's authority to the Fund, which repeated them to the bank. *See id.* at comment a (information may come from third persons who have heard of agent's

authority through permitted channels of communication).

From our review of the parties' stipulations, we agree with Continental that Fund representatives were told that Kavanagh's company would be administering the contract for Old Security, and that the Fund could reasonably have believed that Kavanagh was empowered to transact all business relating to contract administration on Old Security's behalf. Fund representatives may even have introduced Kavanagh as Old Security's associate to the Continental representatives on May 10, and Fund administrators participated in discussions with Kavanagh and Hughes from Continental about the efficiencies of wire transfers. However, at the meeting, Kavanagh gave Hughes an Old Security corporate resolution which stated that all orders for the payment of money from the account must be signed by one of the officers listed on the resolution, or by a person designated by such an officer. While the bank representatives could reasonably have inferred from the Fund's participation in the transfer discussions that the Fund believed Kavanagh had authority to make a transfer, they had no knowledge of the source of the Fund's belief. Moreover, the apparent belief of the Fund that Kavanagh was authorized was in conflict with the only direct information the bank received from Old Security: the corporate resolution. Neither Kavanagh nor the Fund represented that Kavanagh was one of the persons listed on the resolution as having authority to make withdrawals from the account, and the bank made no attempt to confirm with Old Security Kavanagh's status as one authorized to make a transfer. In fact, Hughes realized that without a certificate of incumbency naming Old Security's current officers, the bank would not allow a withdrawal; he therefore suggested the use of the bank's "same name" transfer policy.

Because the corporate resolution put Continental on notice that Old Security had authorized only certain officers and their designees to make withdrawals, it was unreasonable for the bank to rely on the

circumstances of the May 10 meeting and the introduction of Kavanagh as an Old Security associate to allow Kavanagh to transfer $1,500,000 from Old Security's account.

### C. *Ratification*

Continental argues that by agreeing to accept mortgages as a replacement or collateral for the transferred funds, and by representing to the Fund that the premium money had been disbursed to purchase the mortgages, Old Security ratified the unauthorized transfer from its account.

■ Ratification occurs when the principal, with knowledge of the material facts of an unauthorized transaction, takes a position inconsistent with the nonaffirmation of the transaction, *Williams v. Magnafici,* 77 Ill.App.3d 1035, 33 Ill.Dec. 864, 397 N.E.2d 197 (1979); *Karetzkis v. Cosmopolitan National Bank,* 37 Ill.App.2d 484, 186 N.E.2d 72 (1962), or retains the benefits of the unauthorized transaction, *Mueller and Sons, Inc. v. Northern Illinois Gas Co.,* 12 Ill.App.3d 362, 299 N.E.2d 601 (1973). *See Restatement (Second) of Agency* § 93 (1957). The conduct of a principal which can result in ratification reflects the purposes of the doctrine, which acts both to prevent unjust enrichment (as where the principal accepts and retains the benefits of a transaction) or to allow—and in some instances, compel—a principal to accept responsibility for actions done on his behalf.

■ The facts of this case, however, make ratification an inapposite concept upon which to relieve Continental of liability for the transfer. As the previous discussion indicates, the doctrine of ratification allows a principal to affirm a transaction done on his behalf[7] while assuring that no loss accrues to innocent third parties. This case presents neither an innocent third party nor an unauthorized agent acting on his principal's behalf. On the contrary, the faithless agent and the bank are jointly responsible for Old Security's loss from the conversion of $1,500,000 from the company's account.

**7.** The requirement that an act, to be ratifiable, must be performed "on behalf of the principal" extends even to torts committed by an agent.

Continental suggests that Old Security reached a settlement with its agent by agreeing to accept, either as collateral or replacement, mortgages purportedly worth $2,200,000. The bank reasons that such a settlement would relieve the bank of responsibility for the loss, even though the mortgages were worthless, under the doctrine that a principal cannot condition his affirmance of an unauthorized transaction upon his suffering no loss. *See Restatement (Second) of Agency* § 91 (1957). Continental in effect argues that because one of two tortfeasors whose joint conduct occasioned a single loss to Old Security had been Old Security's agent, we should ignore the doctrine that allows the victim of a tort to look to either of the joint tortfeasors for compensation for his loss. *See* Prosser, *Law of Torts* § 46 (1971). We can discern no objective of either the law of ratification or the law of torts which would support such a result. *Cf. Restatement (Second) of Agency* § 85 comment f (1957) (where agent steals principal's chattel and sells it to third party, principal may obtain judgment against agent, but unless judgment satisfied, principal does not lose cause of action against third party).

### D. *Estoppel*

■ Continental argues that Old Security should be estopped from asserting its claim against the bank because representatives of that company falsely assured the bank that the "problem of the missing funds had been alleviated." Estoppel arises only when a party's statement or conduct misleads another into the belief that a right will not be enforced and causes him to act to his detriment in reliance on that belief. *Saverslak v. Davis-Cleaver Produce Co.,* 606 F.2d 208 (7th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980); *Dill v. Widman,* 413 Ill. 448, 109 N.E.2d 765 (1952); *Slavis v. Slavis,* 12 Ill.App.3d 467, 299 N.E.2d 413 (1973). In this case, Continental is therefore required to show that, in reliance on some words or conduct of Old Security, it

*See generally Restatement (Second) of Agency* § 218 (1957).

believed that Old Security would not hold it responsible for the unauthorized transfer, and so it took no steps to recover the funds.

■ The funds were transferred on May 11. Immediately upon learning of the transfer, Old Security president Robert Barton told bank representatives that the transfer was unauthorized. While the record reveals that Hughes of the bank told Barton he would do what he could to recover the funds, there is no evidence that the bank ever took any steps to attempt to retrieve the transferred money.

Continental relies heavily on a stipulation that, at some time before the end of May, Barton told Leonard Sebesta of the bank that Old Security was attempting to get mortgages that would alleviate the problem of the missing funds. There are conflicting accounts of what actually was said to Sebesta but even were we to assume that Barton's statement, although ambiguous, might give Continental some reason to assume that Old Security was itself attempting to rectify the problem, Continental introduced no evidence to show that it relied on Barton's statement in deciding to forego any efforts to retrieve the money. Some time elapsed between the initial notification to Continental that it had allowed an unauthorized transfer and Barton's statement to Sebesta; no action was taken by the bank during that period. Reliance on the conduct of another is an essential element of equitable estoppel, *Hickey v. Illinois Central Railroad Co.*, 35 Ill.2d 427, 220 N.E.2d 415 (1966); *Slavis v. Slavis*, 12 Ill.App.3d 467, 299 N.E.2d 413 (1973), and Continental has made no showing that it relied on any words or conduct of Old Security to its detriment.

### E. *Conspiracy*

Relying on findings made in the second half of this bifurcated trial, Continental argues that Old Security and Kavanagh were co-conspirators or joint venturers, and that Old Security must therefore be held responsible for Kavanagh's actions in transferring the money from its account.

■ It is well-settled that a litigant will not be permitted to raise as a ground for reversal an issue not presented to the trial court. *See, e.g., Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1333 (7th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *Desert Palace, Inc. v. Salisbury*, 401 F.2d 320, 324 (7th Cir.1968). The bank never presented defenses below based on theories of conspiracy or joint venture. Nevertheless, Continental asserts that the relationship between Old Security and its agents should have been apparent to the district court from the extensive stipulations of fact presented by Old Security and Continental. We have reviewed the stipulations, and find no merit to this claim. Nor do we agree with Continental's claim that it was in some manner prevented from presenting defenses based on these theories. At the time the trial in this case was bifurcated, the Fund had filed detailed pretrial compliances with the court outlining its theory that Old Security and its agents were involved in a conspiracy to defraud. Continental moved to strike these pretrial submissions because it and Old Security had stipulated "either the truth of facts or the substance of relevant testimony for the entire case between them." Moreover, no mention of defenses based upon conspiracy or joint venture is made in Continental's post-trial submissions.[8] We refuse now to consider these theories on appeal.

### III.

### *Fund v. Old Security*

#### A.

Old Security was declared insolvent and placed in receivership by the Circuit Court of Cole County, Missouri, on October 20, 1977. The Missouri court at that time enjoined "all persons ... from prosecuting or bringing any action, issuing any process, or

---

**8.** Continental contends that its post-trial submissions were unduly restricted by the trial court, which rejected a proposed 67-page brief, requiring Continental to stay within the briefing limit set by the court. Continental does not contend, however, that the court's limit on the size of the briefs restricted Continental from raising any defense it thought viable.

obtaining any judgment against" the insurance company. Old Security argues that the district court was required to dismiss the Fund's intervention complaint, because under the provisions of the Uniform Insurers Liquidation Act, adopted by Missouri, see Mo.Rev.Stat. § 375.950–.990 (1976), all claims against an insurance company are to be liquidated in one forum.

Old Security has presented this argument to us before. In *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Old Security Life Insurance Co.*, 600 F.2d 671 (7th Cir.1979), we rejected Old Security's argument that it was entitled to a single liquidation forum. While noting that "[p]rotecting the integrity of state insurance insolvency proceedings and concern for their freedom from outside interference" is of great importance, we concluded that the Uniform Insurance Liquidation Act does not itself create an exclusive single-state forum, and could not be interpreted as "precluding a party from pursuing a congressionally-created federal claim [under ERISA]" in the federal court. *Central States*, 600 F.2d at 677.

A more troubling aspect of this litigation concerns the Missouri court's assertion of *in rem* jurisdiction over the assets of Old Security prior to the instigation of this lawsuit. Old Security argues that the Fund's intervention complaint sounded *in rem*, and its prosecution was in violation of the previously-asserted jurisdiction of the Missouri receivership court. In order to understand Old Security's claim, it is necessary to relate the procedural history of the Fund's intervention in the lawsuit between Old Security and Continental.

The Fund filed its original action against Old Security and sixty other defendants on August 4, 1976, seeking to recover $7 million in Fund assets allegedly diverted and misappropriated by the defendants' insurance fraud conspiracy. The Fund's complaint charged the defendants with breach of contract, fraud, conspiracy, breach of fiduciary duty under state law, and breach of statutory duties as fiduciaries under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1976)

("ERISA"). *See Central States*, 600 F.2d at 673. Old Security in turn filed its lawsuit against Continental on September 29, 1976, charging Continental with making an unauthorized transfer from its account. The Fund sought to consolidate the two actions or, alternatively, to intervene in the action between Old Security and Continental. The basis of the Fund's Motion to Intervene was that the Fund "claim[ed] an interest in one-hundred percent of the property which [Old Security] seeks to recover" in its action. The Fund was granted leave to intervene on February 15, 1979 and, upon its motion, the action was bifurcated to allow Old Security's claim against the bank to be litigated first. Old Security prevailed, and judgment was entered in its favor, although execution upon the judgment was stayed pending adjudication of the rights of the intervenor.

The nature of the Fund's claim becomes clear from a reading of its complaint:

[T]he [Fund] Trustees claim superior and exclusive right, title and interest to any judgment in favor of Old Security against Continental Bank arising from the May 11, 1976 unauthorized transfer, on grounds that [the Fund] retains title to the monies on deposit in [the account]; on grounds that Old Security held the monies on deposit in [the account] as an actual and/or constructive trustee for the benefit of the Fund and its participants . . . .; on grounds that the Fund, and only the Fund, suffered damage as a result of the unauthorized transfer; and on grounds that, to the extent Old Security has any right to judgment against Continental, it obtains such judgment only as representative of and trustee for the Fund.

The Fund's claim of superior title and interest to the judgment Old Security had won against Continental was based on its allegations that Old Security had obtained the Fund contract, and hence the money in the Continental account, by fraud, and by corruption of a Fund fiduciary in violation of ERISA. It sought entry of an order "declaring the rights and legal relations

... between the Trustees and Old Security with respect to the $1.5 million judgment entered against Continental Bank," specifically, that the judgment be impressed with a constructive trust by virtue of which the Fund would be entitled to receive "all proceeds realized from execution on" that judgment.

After a trial, Judge Kocoras concluded that the Fund had been the victim of a fraud which resulted in the award of the Fund insurance contract to Old Security. He therefore vacated the judgment in favor of Old Security and entered judgment against Continental in favor of the Fund.

Old Security argues that the Fund sought through its action to gain control of a *res* —the judgment previously entered in Old Security's favor—and that it was precluded from doing so by the Missouri court's assertion of jurisdiction over all assets of the insurance company. We do not agree that the district court lacked jurisdiction to decide the dispute between Old Security and the Fund. We do agree, however, that the substitution of the Fund for Old Security in the previously-rendered judgment interfered with the Missouri court's jurisdiction over Old Security's assets.

As we noted in *Central States*, it is settled that the federal courts have exclusive jurisdiction over ERISA claims for breach of fiduciary duty. *See Central States*, 600 F.2d at 676 and authorities cited therein. Therefore, the Fund was entitled to a federal forum in which to litigate its claim based upon violations of that statute. Once a judgment had been entered in favor of Old Security in the amount of $1.5

million, however, that judgment, and the rights that flowed from it, became assets of the insurance company and thus subject to the jurisdiction of the Missouri receivership court.[9]

While the fact that a complaining party requests a form of relief that a court cannot grant has no effect upon the court's jurisdiction to decide the underlying dispute, *see Oman Construction Co. v. International Brotherhood of Teamsters*, 263 F.Supp. 181 (M.D.Tenn.1966), that jurisdiction should be exercised in a manner that does not interfere with properties which have been brought within the jurisdiction of another court. *Purcell v. Summers*, 126 F.2d 390 (4th Cir.), *cert. denied*, 317 U.S. 640, 63 S.Ct. 32, 87 L.Ed. 516 (1942). As the Supreme Court has stated:

[W]hile a federal court may not exercise its jurisdiction to effect or disturb the possession of property in the custody of the state court, it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court.

*Markham v. Allen*, 326 U.S. 490, 494, 66 S.Ct. 296, 298, 90 L.Ed. 256 (1946) (citations omitted). *See also First Charter Land Corp. v. Fitzgerald*, 643 F.2d 1011 (4th Cir.1981). The Fund was entitled to a judgment that Old Security was liable to it in the amount of $1.5 million. It was not entitled to step to the front of the line before all of Old Security's other creditors

9. The Fund argues that because this court determined that the judgment was not final for purposes of appeal, it was not a "final judgment" and could not therefore comprise property of the receivership. *See Old Security Life Insurance Co. v. Continental Illinois National Bank and Trust Co.*, Nos. 80–2296, 80–2297 (Unpublished Order) (7th Cir. Nov. 19, 1980). In that order, we granted the Fund's motion to dismiss the appeal because we could not determine that the district court had severed the cases before it, and therefore intended the Old Security-Continental litigation to be separately appealable. The appeal was dismissed without prejudice to

any motion to the district court to certify the judgment for immediate appeal under Fed.R. Civ.Pro. 54(b). However, the judgment in favor of Old Security was entered in accordance with Rule 58. While it may not have been final for purposes of appeal, *cf.* Rule 54(b), it was a "judgment." The cases cited by the Fund for the proposition that a creditor who has not reduced his claim to judgment has no ownership or property interest in the proceeds that may ultimately be realized from his claim, *see Vidal v. South American Securities Co.*, 276 F. 855 (2d Cir.1921), are inapposite.

in the receivership court by obtaining a substitution of itself as judgment creditor in Old Security's place.[10]

### IV.

Old Security attacks the district court's judgment on several fronts. First, it argues that the Fund did not prove any of the elements of its fraud case by clear and convincing evidence. Even were fraud proven, Old Security contends, it is not responsible for the actions of the Hauser group. Finally, Old Security claims that the district court erred in not drawing adverse inferences against the Fund when three Fund trustees refused to testify and invoked the Fifth Amendment.

### A.

 In order to prove that it was defrauded, the Fund was required to show that Old Security misrepresented material facts in its bid, that the Fund relied on these facts, and that it was injured because of this reliance. *Merit Insurance Co. v. Colao*, 603 F.2d 654, 658 (7th Cir.1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 463, 466 (7th Cir.1968); *Roth v. Roth*, 45 Ill.2d 19, 256 N.E.2d 838 (1970); *Roda v. Berko*, 401 Ill. 335, 81 N.E.2d 912 (1948). It is undisputed that Old Security did not reveal its agreement with Family Provider. Old Security argues that the omission was immaterial, because the bid specifications did not ask for disclosure of reinsurance agreements, and such agreements were common practice in the industry. However, the Fund's expert testified without contradiction, and the district court found, that the agreement between Family Provider and Old Security was not a valid reinsurance agreement, but was in reality a payment to Family Provider for obtaining for Old Security an opportunity to bid. While Old Security disputes this finding, it is supported by ample evidence. The Fund contract, with its approximately $24,000,000 annual premium, was a "cost-plus" contract. Under such a contract, the insurer assumes no insurance risks, because the policy purchaser is contractually bound to reimburse the insurance company if the claims paid exceed the total premium paid, plus an agreed retention rate. Under such a contract there is no valid business reason for reinsuring, which is typically done to protect an insurance company against the risks it assumes under a contract. Nor did Old Security reveal that it was paying Tolley a commission under its Indiana Fund contract. Old Security argues that the fact that it paid the commissions rather than the Indiana Fund was a simple matter of bookkeeping expediency. However, the reasons for the arrangement are irrelevant; the commission payments were being made, and Shannon testified that he had previously disqualified an insurance analyst because he received such payments. The Fund expert testified, and the district court agreed, that it was a violation of industry standards for Old Security not to reveal the nature of its agreement with Family Provider and Tolley. Three trustees testified that had they known of the arrangements, they would not have awarded the contract to Old Security, and Shannon testified that had he known, he would not have delivered the first premium check. Finally, the trustees testified that they relied on the recommendation of the Fund's insurance expert, Teeuws, in voting to award the contract to Old Security. These facts establish the requisite misrepresentation and reliance for a finding that the Fund had been defrauded.

### B.

Old Security argues, however, that it cannot be found responsible for the actions of Teeuws and Hauser, because the Fund

---

**10.** Old Security and several *amici* contend that the district court should have abstained from deciding the dispute between Old Security and the Fund in order to avoid unduly disrupting the orderly liquidation of Old Security's assets in the receivership court. We reject that contention for the reasons stated in *Central States*, 600 F.2d at 674. We note, however, that the course we now outline will not disrupt those proceedings; the Fund will be required to satisfy its judgment in the receivership court, where it will be given the priority mandated by the Missouri act.

did not establish that Old Security conspired with the Hauser group to defraud the Fund. According to Old Security, it was completely unaware of Hauser's corruption of Teeuws, and cannot be held to have joined a conspiracy to corrupt a Fund fiduciary.

 Civil conspiracy is an agreement of two or more people to commit an unlawful act, or to inflict a wrong against another, and an overt act that results in damages. *Lenard v. Argento*, 699 F.2d 874 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); *Zokoych v. Spalding*, 36 Ill.App.3d 654, 344 N.E.2d 805 (1976); *Reel v. City of Freeport*, 61 Ill.App.2d 448, 209 N.E.2d 675 (1965). The undisputed evidence establishes that Old Security agreed with Family Provider to try to win the Fund contract. Both Halford and Barton testified that they believed Family Provider was responsible for Old Security receiving the contract, and Barton testified that it was obvious that Family Provider had an inside connection. Moreover, Old Security was on notice of Hauser's involvement with Family Provider, but chose not to investigate his connection.[11] Old Security agreed to allow its name to be used by a company it knew did no business, had few assets, and had no business history in return for what was described by various people on both sides of this case as the most attractive piece of insurance business in the country. As Old Security knew, Family Provider's purpose was to obtain the Fund business for Old Security, and Old Security cannot now disavow any connection with the methods used by Family Provider to accomplish its goal. It is equally responsible for the acts of its co-conspirators, even though it might not have known the exact limits of the illegal plan or the identity of all the participants. *Lenard v. Argento*, 699 F.2d 874, 883 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct.

69, 78 L.Ed.2d 84 (1983); *Zokoych v. Spalding*, 36 Ill.App.3d 654, 344 N.E.2d 805 (1976).

### C.

 Old Security contends that, even if there was a conspiracy to defraud, that conspiracy did not cause the Fund's damages. Rather, Old Security claims that the Fund was damaged by its own decision to refuse to submit further claims under the contract.[12]

This argument ignores the fact that the object of the conspiracy was achieved through a breach of trust on the part of a Fund fiduciary, Len Teeuws. Where, as here, a party receives money as the result of fraud or breach of fiduciary duty, the recipient is imposed with the status of trustee *ex maleficio*, and holds the property in constructive trust for the benefit of the beneficiary. *See, e.g., Tcherepnin v. Franz*, 485 F.2d 1251 (7th Cir.1973), *cert. denied sub nom. McGurren v. Ettleson*, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); *Village of Wheeling v. Stavros*, 89 Ill.App.3d 450, 44 Ill.Dec. 701, 411 N.E.2d 1067 (1980). Whether or not we accept Old Security's claim that despite its insolvency in August 1976, it could have performed the Fund contract, its status as constructive trustee mandates that it account to the Fund for the loss of the premium it received.

### D.

 Old Security's final argument is that the district court erred by refusing to give any evidentiary weight to the fact that three Fund trustees invoked the Fifth Amendment and refused to testify. According to Old Security, the trustees awarded the bid to Old Security in order to allow Allen Dorfman's firm, Amalgamated Insurance Agency, to continue to process claims and solicit "add-on" insurance.[13]

**11.** In fact, Old Security in July 1976 transferred several million dollars to a company it knew was controlled by Hauser in an attempt to avoid having to perform the Fund contract.

**12.** This decision was prompted both by a newspaper article which suggested that Fund premiums had been diverted, and by the Fund's dis-

covery that Old Security had negotiated an assumption agreement with a Hauser-controlled company.

**13.** As its name suggests, "add-on" insurance is insurance offered in addition to that offered under the employee benefit plan.

Old Security contended at trial that Teeuws told Hauser to contact Richard Kleindienst, former United States Attorney General, and have him persuade Frank Fitzsimmons to influence the award vote on Old Security's behalf. According to Old Security, the trustees did not rely on Teeuws's recommendation; instead, they awarded the contract to Old Security as a favor to Fitzsimmons. Old Security contends that the trustees' refusal to testify is additional evidence of their complicity in an independent scheme involving Hauser, Dorfman, and Kleindienst.

The district court agreed that it was required to draw an inference that the testimony of a witness claiming a Fifth Amendment privilege would be incriminating in all ways suggested by other evidence. *See, e.g., Brink's, Inc. v. City of New York*, 717 F.2d 700, 709–10 (2d Cir.1983). However, the court found that Old Security's theory of the case was unsupported by the evidence, and concluded:

> A trustee's assertion of the Fifth Amendment will not, without more, allow a conclusion that he knew of the conspiracy—a conspiracy that was overwhelmingly demonstrated by the evidence here—that he became a member of that conspiracy; and, by his own acts, furthered it.

We have comprehensively reviewed the lengthy record in this case, and agree with the district court that Old Security's theory of trustee malfeasance was not supported by the evidence. Kleindienst freely admitted that he had been retained to find out if there were problems with Old Security's bid. He testified that he called Fitzsimmons, told him he was representing Old Security, and expressed concern that there might be problems with the bid. Fitzsimmons checked, and told Kleindienst that the bid appeared to be in order. Kleindienst testified, and Fitzsimmons concurred, that Fitzsimmons never told him Old Security would get the contract, nor did he give him any assurances about the award. Fitzsim-

mons testified that he told Kleindienst that Old Security's bid was competitive, and if it was a viable company, it would get as much consideration as any of the other companies that bid.

We find no error in the district court's conclusion that it could draw no inferences from the refusal of the trustees to testify.

## V.

For the reasons stated above, we affirm the findings of the district court, and remand to the district court with instructions to reinstate the judgment in favor of Old Security in its litigation with Continental Bank, and enter a $1.5 million judgment in favor of the Fund in its action against Old Security. Each party shall bear its own costs on appeal.